Filed 8/3/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARK BRAWERMAN et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> LOEB & LOEB LLP et al., <br><br> Defendants and Respondents. | B305802 <br><br> (Los Angeles County <br> Super. Ct. No. BC576947) |

APPEAL from judgment of the Superior Court of Los Angeles County, Timothy Patrick Dillon, Judge. Affirmed.

Law Office of Steven R. Friedman, Steven R. Friedman and Michael E. Friedman, for Plaintiffs and Appellants.

Jeffer Mangels Butler & Mitchell, Robert E. Mangels and Andrew I. Shadoff, for Defendants and Respondents.

_____

## INTRODUCTION

We are asked to consider whether the trial court erred in confirming an arbitration award where the obligation to arbitrate arose from a provision in a law firm retainer agreement and one of the several law firm attorneys that rendered legal services pursuant to the retainer agreement did so in violation of California's attorney licensing requirements.

There was no error. *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 (*Birbrower*) dictates that the unlicensed attorney's illegal practice of law pursuant to the retainer agreement does not render the entire retainer agreement illegal. *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 30 (*Moncharsh*) holds that an arbitration provision is severable from an agreement that is not entirely illegal (unless the arbitration provision itself is illegal). There is no claim here of any illegality in the retainer agreement's arbitration provision. Accordingly, we affirm.

## BACKGROUND[1]

### A. Brawerman Builds a Successful Business

Plaintiff and appellant Mark Brawerman founded Turtle Mountain, Inc. (TMI), the other plaintiff and appellant, for the purposes of developing and marketing healthy alternative frozen dessert products. When demand for his products exceeded his

---

[1] The facts recited herein are taken from facts and evidence in the record and the trial court's statement of decision. "We view the facts most favorable to the judgment under the principle requiring us to presume the lower court's judgment is correct, and draw all inferences and presumptions necessary to support it. [Citations.]" (*Chapala Management Corp. v. Stanton* (2010) 186 Cal.App.4th 1532, 1535.)

capacity to produce them, Brawerman sought venture capital funds to build a new production facility.

### B. Brawerman and TMI Engage Loeb

To that end, Brawerman entered talks with Wasserstein & Co. (Wasserstein), a venture capital firm. As those talks progressed, Brawerman sought legal representation from defendant and respondent Loeb & Loeb, LLP (Loeb). Brawerman did so on the advice of his father, who was a former partner at Loeb.

By agreement dated December 28, 2004 (the Retainer Agreement), Brawerman and TMI retained Loeb to "represent [them] in a financing transaction with Wasserstein Ventures or another investor." The agreement is in the form of a letter from Loeb attorney Thomas Rohlf, who was a senior partner in Loeb's corporate practice and resident in its Los Angeles office. Rohlf stated in the Retainer Agreement that he "w[ould] be principally responsible for the representation" and disclosed an hourly rate of $550. No other attorney was mentioned in the Retainer Agreement and no other rate was specified therein.

The Retainer Agreement also contained an arbitration provision stating, in relevant part: "if any dispute between you and the firm arises out of this Agreement, our relationship with you or our performance of any current or future legal services, . . . that dispute will be resolved solely by binding arbitration in Los Angeles, California, before a retired California superior court judge under the auspices and the commercial arbitration rules of the American Arbitration Association. . . . Arbitration will be the sole means of resolving any such disputes, and both parties waive their rights to resolve disputes by jury trial or other court

3

proceedings." Brawerman signed the Retainer Agreement for himself and TMI and Rohlf signed for Loeb.

In late December 2004, Rohlf asked defendant and respondent Christopher Kelly, then a Loeb associate, to assist him in Loeb's representation of Brawerman and TMI. At the time, Kelly was not admitted to the California bar. He had practiced law since 1999 and was admitted to the bars of New York and New Jersey.

Between late December 2004 and July 2005 when the transaction closed, Kelly, in collaboration with other Loeb attorneys that were licensed California attorneys at the time, negotiated and drafted documents for the transaction with Wasserstein. In total, Loeb attorneys billed approximately 928 hours, of which Kelly billed approximately 382.

### C. Loeb Fails to Protect Brawerman's Control

One of Brawerman's objectives in negotiations with Wasserstein was to retain control of TMI's business once he and Wasserstein became joint owners of a new operating company (LLC). He communicated this objective to Kelly and other Loeb attorneys. However, their documents failed to achieve this objective. That failure proved consequential.

Over the course of their joint ownership of LLC, the Brawerman-Wasserstein relationship soured. In March of 2014, Wasserstein converted sufficient preferred shares in LLC to take majority control of LLC and replaced LLC's Board of Managers with a Wasserstein majority. Shortly before this, concerned about where the relationship was headed, Brawerman and TMI entered into a contingency fee agreement with the law firm of Steven R. Friedman. They did so to "potentially fend off litigation which might have been, but was never actually brought

4

against Brawerman" by Wasserstein. In exchange for the Friedman firm standing at the ready to defend them, Brawerman and TMI agreed to pay it 15 percent of the gross amount in excess of $18 million received by TMI from a sale of LLC.

**D. The Business Is Sold**

LLC was sold in September of 2014. Based on the proceeds to TMI, the Friedman firm earned a fee of $5.6 million. Brawerman did not believe that the price received in the sale was affected in any way by Loeb's failings nor did he have any reason to believe that such failings interfered with the sale.

**E. Brawerman and TMI Sue Loeb and the Matter Is Referred to Arbitration**

In March of 2015, Brawerman and TMI sued Loeb and Kelly in California Superior Court, asserting causes of action for professional negligence and breach of fiduciary duty. They were represented in that action, as they are here, by the Friedman firm. The damages sought were the amount that they paid the Friedman firm to "potentially fend off litigation" with Wasserstein in connection with the sale of LLC.

Loeb and Kelly moved to compel arbitration pursuant to the Retainer Agreement and the trial court granted the motion in November 2015.

**F. The Arbitration**

In early 2019, shortly before the arbitration hearing was set to commence, Brawerman and TMI announced that they had discovered that Kelly was not licensed to practice in California while he was working on the Wasserstein transaction in 2004 and 2005. Based on this information, they filed a motion to remand to the trial court or empanel a jury before the arbitrator. This was warranted, they claimed, because Kelly's licensure status

5

constituted a fraud that voided the entire Retainer Agreement. The arbitrator denied the motion, concluding that the arbitration provision was severable.

The arbitration hearing proceeded in February of 2019. The arbitrator found that Loeb and Kelly were liable to Brawerman and TMI for their failure to protect Brawerman's control over the business or to disclose to Brawerman such lack of control. However, the arbitrator found that this conduct did not harm Brawerman and TMI because they could not show that the contingency fee paid to the Friedman firm was caused by Loeb and Kelly's failings. Nevertheless, the arbitrator ordered disgorgement to Brawerman and TMI of $138,075 in fees paid for Kelly's services while he was unlicensed and $94,933 for Brawerman and TMI's fees incurred in the arbitration in connection with litigating that issue.

### G. Post-Arbitration Proceedings in the Superior Court

Brawerman and TMI moved the trial court to vacate the Award. They again argued that the Retainer Agreement, including its arbitration clause, was illegal and unenforceable because Kelly was unlicensed to practice law when he performed services for Brawerman and TMI pursuant to that agreement.

The trial court denied the motion and confirmed the arbitration award. The basis for the trial court's ruling is explained in a thorough statement of decision. Judgment entered and this appeal followed.

## DISCUSSION

The grounds for vacating an arbitration award are limited to those specified by statute. (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 72 (*Sheppard*).)

Brawerman and TMI's central premise—that the entire Retainer Agreement is "illegal and void as a matter of public policy"—implicates Code of Civil Procedure section 1286.2, subdivision (a)(4). Subdivision (a)(4) provides that a court shall vacate an award when "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (§ 1286.2, subd. (a)(4).)

Arbitrators exceed their powers to make an award where "the arbitration has been undertaken to enforce a contract that is 'illegal and against the public policy of the state.' " (*Sheppard, supra*, 6 Cal.5th at p. 73.) This is because "the power of the arbitrator to determine the rights of the parties is dependent upon the existence of a valid contract under which such rights might arise. [Citations.] In the absence of a valid contract no such rights can arise and no power can be conferred upon the arbitrator to determine such non-existent rights." (*Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 610 (*Loving*).)

The trial court confirmed the arbitration award after determining, upon its independent review of the evidence before it, that the Retainer Agreement was legal, even if performance thereunder was not, such that the arbitration provision remained enforceable. (See *Loving, supra*, 33 Cal.2d at p. 609 [trial court determines legality of agreement in the first instance

7

notwithstanding any determination made by the arbitrator].)
It is this conclusion which we review for error.

## I. Standard of Review

Brawerman and TMI contend that our review should be entirely de novo. Loeb and Kelly disagree to the extent such rigorous scrutiny is urged for factual issues. Loeb and Kelly's point is well taken. " ' " 'On appeal from an order confirming an arbitration award, we review the trial court's order (not the arbitration award) under a de novo standard. [Citations.] To the extent that the trial court's ruling rests upon a determination of disputed factual issues, we apply the substantial evidence test to those issues.' " ' [Citations.]" (*Roussos v. Roussos* (2021) 60 Cal.App.5th 962, 973 (*Roussos*).)

Brawerman and TMI offer four reasons that our review should be entirely de novo. First, they assert that illegality of a contract may be raised for the first time on appeal, and it therefore follows that review should be de novo. Even if Brawerman and TMI were correct that illegality may be raised for the first time on appeal in the context presented here,[2] it would not turn this court into a trial court. Brawerman and TMI

---

[2] We note authority indicating that illegality of an entire contract for purposes of avoiding arbitration *cannot* be raised for the first time on appeal. Indeed, it must be raised for the first time in the trial court *before* the matter is sent to arbitration. (See *Moncharsh, supra*, 3 Cal.4th at p. 29-30 [a party contending the entire arbitration agreement is unlawful generally must raise the issue at the outset in the trial court].) Loeb and Kelly do not raise Brawerman and TMI's failure at the outset to raise illegality as a ground for resisting arbitration, so we do not consider it.

8

raised the issue of illegality to the trial court, putting us in our usual role of reviewing the trial court's decision. Thus, there is no reason to deviate from our usual standards of review.

Second, they argue that there are no disputed facts. But this is plainly incorrect. Brawerman and TMI, on the one hand, and Loeb and Kelly, on the other, dispute whether any agreement exists by virtue of the Retainer Agreement. Where the existence of a contract is at issue and the evidence is conflicting or permits more than one inference, it is for the trier of fact to determine whether the contract actually existed. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) Relevant to this inquiry are the parties' purposes and intents in executing the Retainer Agreement. "[Q]uestions of 'intent' and 'purpose' are ordinarily questions of fact to be determined by the trial court." (*Redke v. Silvertrust* (1971) 6 Cal.3d 94, 103 (*Redke*).)

Third, they argue that de novo review is appropriate because the trial court did not hear witnesses, but rather reached its decision based on the same "written paperwork" that is now before us. But our deference to factual determinations made by the trial court in confirming an arbitration award is the same whether based on live testimony or written submissions: " 'We must accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence.' " (*Trabuco Highlands Community Assn. v. Head* (2002) 96 Cal.App.4th 1183, 1189.)

Fourth, they argue that the court's jurisdiction and authority relating to attorney misconduct warrants independent

9

review.  The only citation they offer relating the two issues is *In re Rose* (2000) 22 Cal.4th 430.  *In re Rose* involved the Supreme Court's exercise of original jurisdiction specifically conferred by Business and Professions Code section 6082 over a petition to review a disbarment order of the California State Bar Court (a non-judicial regulatory body).  (*In re Rose,* at p. 436.) We are reviewing a lower court's order confirming an arbitration award, not conducting attorney discipline proceedings.  And our jurisdiction has been invoked by appeal, not through any original petition.  *In re Rose* has no application here.

Accordingly, we will review issues of law de novo and issues of fact for substantial evidence.  (*Roussos*, *supra*, 60 Cal.App.5th at p. 973.)

## II.    Analysis

Brawerman and TMI argue that *Sheppard* controls the outcome of this case, whereas Loeb and Kelly contend *Birbrower* is dispositive.  We thus begin with an analysis of these two decisions.

### A. *Sheppard*

*Sheppard*, like this case, concerned the arbitrability of disputes arising from a law firm engagement agreement. The agreement was between the Sheppard law firm and J-M Manufacturing (J-M), whereby Sheppard agreed to defend J-M in a federal qui tam action brought on behalf of several public entities.  Among those entities was the South Tahoe Public Utility District (South Tahoe).  Undisclosed to J-M at the time of the engagement was the fact that Sheppard also represented South Tahoe in unrelated matters.  After Sheppard had been representing J-M for about a year in the qui tam action, South Tahoe discovered the dual representation and had Sheppard

10

disqualified.  At the time of its disqualification, Sheppard's unpaid fees for services to J-M stood at more than $1 million. (*Sheppard*, *supra*, 6 Cal.5th at p. 70.)

Sheppard sued J-M in California superior court for the unpaid fees and moved to compel arbitration pursuant to an arbitration provision in the engagement letter.  J-M opposed, asserting that the conflict of interest from Sheppard's representation of South Tahoe rendered the entire agreement illegal and unenforceable.  The superior court ordered arbitration and the arbitrators ruled in Sheppard's favor, awarding it more than $1.3 million in fees and interest.  (*Sheppard*, *supra*, 6 Cal.5th at p. 71.)

J-M thereafter petitioned the superior court to vacate the award, again arguing that the engagement agreement was illegal and unenforceable due to Sheppard's simultaneous representation of adverse interests in violation of rule 3-310(C)(3) of the Rules of Professional Conduct.  The superior court confirmed the award and J-M appealed.  The Court of Appeal reversed and the Supreme Court granted Sheppard's petition for review.  (*Sheppard*, *supra*, 6 Cal.5th at pp. 71-72.)

In relevant part, the *Sheppard* court concluded that a court may invalidate an arbitration award on the ground that the agreement containing the arbitration agreement violates the public policy of the state as expressed in the Rules of Professional Conduct.  The court recognized that Civil Code section 1667 makes "a contract unlawful, and therefore unenforceable, if it is '[c]ontrary to an express provision of law' or '[c]ontrary to the policy of express law, though not expressly prohibited.'  (Civ. Code, § 1667.)"  (*Sheppard, supra,* 6 Cal.5th at p. 73.)  The Rules of Professional Conduct, it reasoned, are an expression of public

11

policy, and "an attorney contract that has as its object conduct constituting a violation of the Rules of Professional Conduct . . . is therefore unenforceable." (*Id.* at p. 74.) Importantly, it was insufficient that the contract merely contained an unlawful provision. The court had previously held in *Moncharsh*, *supra*, 3 Cal.4th at page 30, that where "the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable." An agreement to arbitrate thus becomes unenforceable only where the entire contract is invalid and unenforceable as violative of public policy. (*Sheppard*, *supra*, 6 Cal.5th at pp. 71-72.)

The court then turned to the question of whether the Sheppard/J-M engagement agreement was entirely void. It concluded that it was. This conclusion rested on three points: (1) at the time Sheppard agreed to represent J-M Manufacturing in the qui tam action, it also represented J-M's adversary, South Tahoe, in unrelated matters; (2) Sheppard failed to obtain J-M's informed consent to the conflict as required by the Rules of Professional Conduct; and (3) the conflict "affected the whole of its engagement agreement with J-M, rendering it unenforceable in its entirety." (*Sheppard*, *supra*, 6 Cal.5th at pp. 80–81.) The first two points established Sheppard's ethical violation, which was different than Loeb's and Kelly's established violations here, leaving only the third point relevant to our analysis.

Sheppard's ethical violation served to invalidate the entire engagement agreement because the object of the agreement was itself the ethical breach. The court reasoned that the object of the engagement agreement was the representation of J-M in the qui tam action—"a representation that violated rule 3-310(C)(3)."

12

(*Sheppard*, *supra*, 6 Cal.5th at p. 87.)  Importantly, it was the wrongfulness of its very formation that rendered the contract unenforceable.  The court explained:  "[V]iolation of a Rule of Professional Conduct in the formation of a contract can render the contract unenforceable as against public policy.  That is what happened here when [Sheppard] agreed to represent J-M in the qui tam action, while also representing South Tahoe on other matters, without obtaining J-M's informed consent. . . . [T]he agreement itself is contrary to the public policy of the state.  The transaction was entered under terms that undermined an ethical rule designed for the protection of the client as well as for the preservation of public confidence in the legal profession.  The contract is for that reason unenforceable."  (*Ibid*.)

### B.  *Birbrower*

*Birbrower* does not address the enforceability of an arbitration provision in an engagement agreement.  Rather, as relevant for our purposes, it addresses whether a violation of Business and Professions Code section 6125 rendered a fee agreement between a law firm and its client wholly unenforceable.  (*Birbrower*, *supra*, 17 Cal.4th at p. 126.)

The Birbrower law firm was a New York firm.  None of its attorneys were licensed to practice law in California.  Its client, ESQ, was a California corporation involved in a contract dispute governed by California law with another California domiciliary.  (*Birbrower, supra,* 17 Cal.4th at p. 124.)  Nonetheless, the Birbrower attorneys undertook the matter and traveled repeatedly to California to advise ESQ, negotiate with ESQ's counterparty, and interview arbitrators that might resolve the dispute.  They also performed work in New York.  The dispute

13

eventually settled and the fee agreement called for payment from ESQ to Birbrower of more than $1 million. (*Id.* at pp. 125–126.)

Dissatisfied with the result, ESQ sued Birbrower and Birbrower counterclaimed for unpaid fees. ESQ won summary judgment on Birbrower's fee claims on the ground that, by practicing law in California without a license, Birbrower violated Business and Professions Code section 6125, rendering the fee agreement unenforceable. The Court of Appeal affirmed, "reason[ing] that the agreement was void and unenforceable because it included payment for services rendered to a California client in the state by an unlicensed out-of-state lawyer." (*Birbrower, supra*, 17 Cal.4th at p. 135.)

The Supreme Court disagreed that the unlicensed work pursuant to the fee agreement invalidated the entire agreement. Acknowledging that the fee agreement "became illegal when Birbrower performed legal services in violation of section 6125," it recognized that illegal contracts "will be enforced under certain circumstances, such as when only a part of the consideration given for the contract involves illegality. In other words, notwithstanding an illegal consideration, courts may sever the illegal portion of the contract from the rest of the agreement." (*Birbrower, supra*, 17 Cal.4th at p. 138.)

A lack of clarity regarding the terms of the *Birbrower* fee agreement made severance by the Supreme Court impossible, but it provided a framework for the trial court to apply on remand. The remand instructions made clear that a violation of Business and Professions Code section 6125 pursuant to a fee agreement does not render that agreement void. The court explained, "ESQ was to pay money to Birbrower in exchange for Birbrower's legal services. The object of their agreement may not have been

14

entirely illegal, assuming ESQ was to pay Birbrower compensation based in part on work Birbrower performed in New York that did not amount to the practice of law in California. The illegality arises, instead, out of the amount to be paid to Birbrower, which, if paid fully, would include payment for services rendered in California in violation of section 6125." (*Birbrower*, *supra*, 17 Cal.4th at p. 139.)

It continued, "the Court of Appeal erred in determining that the fee agreement between the parties was entirely unenforceable because Birbrower violated section 6125's prohibition against the unauthorized practice of law in California. . . . [¶] . . . [T]he portion of the fee agreement . . . that includes payment for services rendered in New York may be enforceable to the extent that the illegal compensation can be severed from the rest of the agreement." (*Birbrower*, *supra*, 17 Cal.4th at p. 139.) The Supreme Court remanded to take new evidence relevant to severance and determine whether any amount remained owing for services Birbrower rendered in New York. (*Id.* at pp. 139-140.)

### C. *Sheppard* and *Birbrower* Compel Affirmance Here

We agree with the trial court that, read together, *Sheppard* and *Birbrower* required confirmation of the Award in this case. The arbitration provision in the Sheppard/J-M engagement agreement was unenforceable only because the ethical violation rendered the *entire agreement* unenforceable. (*Sheppard*, *supra*, 6 Cal.5th at pp. 76–77, 87.) *Birbrower* makes clear that the unlicensed practice of law by firm attorneys does not completely invalidate an agreement pursuant to which firm attorneys also engaged in the licensed practice of law. (*Birbrower*, *supra*, 17 Cal.4th at p. 139.)

15

Here, the central misconduct that Brawerman and TMI contend invalidates the Retainer Agreement is the same as the misconduct at issue in *Birbrower*: an attorney licensed in other states but not in California[3] engaged in the practice of law in California. Brawerman and TMI allege that this conduct resulted in a number of related violations, including failure to disclose "Kelly's criminal lack of licensure," holding Kelly out as attorney, and "permitt[ing] Kelly to deceive third parties and their own clients" regarding his license status. But none of this creates a meaningful distinction from *Birbrower*.[4] Whether the lack of licensure was withheld or disclosed was irrelevant in *Birbrower*. (*Birbrower*, *supra*, 17 Cal.4th at pp. 125, 136 [acknowledging factual dispute concerning client's knowledge about Birbrower attorneys' lack of license].) So too was the fact that the unlicensed practice was criminal. (*Id*. at p. 127 [acknowledging that unlicensed practice of law is a misdemeanor].)

---

[3] While Kelley's licensure status in other states does not excuse his violation of California law, Brawerman and TMI's repeated references in briefing to Kelly as "not an attorney" and "not licensed to practice law" are inaccurate and misleading.

[4] In addition, the trial court noted that Brawerman and TMI failed to timely raise these asserted related violations below, waiting until their reply in support of their motion to vacate to suggest them to the trial court. As a result, they are waived here as well. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 (*Mahaffey*) [issues not timely raised below not ordinarily considered on appeal].)

The circumstances that saved the fee agreement in *Birbrower* are also present here. Although the Birbrower attorneys did "substantial" unlicensed work in California, they also did licensed work in New York. Here, though Kelly illegally did substantial work under the Retainer Agreement, other Loeb attorneys who *were* licensed in California also performed work for Brawerman and TMI under the same agreement. Brawerman and TMI met with and retained Rohlf and his firm, and the Retainer Agreement contains no reference to Kelly. Under these circumstances, we are bound to follow *Birbrower* and conclude that Kelly's illegal work did not invalidate the entire Retainer Agreement, and we are further bound to follow *Sheppard* and *Moncharsh* and conclude that the Retainer Agreement's arbitration provision therefore remains enforceable.

Brawerman and TMI finally address *Birbrower* for the first time on the 79th page of their reply brief.[5] Their primary attack on the decision is nothing short of disingenuous. They represent that reliance on *Birbrower* "is improper" because it " 'was promptly overruled by the California legislature' by the passage

---

[5] We note that, despite Brawerman and TMI's primary reliance on *Birbrower* before the arbitrator, and despite both the arbitrator and the trial court relying on *Birbrower* in rendering decisions adverse to them, Brawerman and TMI failed to cite *Birbrower* in their opening brief. As a decision of our Supreme Court, *Birbrower* is binding on this court. We remind counsel that rule 3.3(a)(2) of the Rules of Professional Conduct states: "A lawyer shall not . . . fail to disclose to the tribunal[] legal authority in the controlling jurisdiction known[] to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ."

17

of CCP §1282.4." (Quoting *Prudential Equity Group, LLC v. Ajamie* (S.D.N.Y. 2008) 538 F.Supp.2d 605, 608 [New York law].) They continue, "CCP §1282.4 expressly mentions that it is a 'response to the holding of *Birbrower*' and is designed to overrule *Birbrower*." What Brawerman and TMI fail to mention is that Code of Civil Procedure section 1282.4 does not address *Birbrower*'s holding relevant to this case—the severability of an agreement between attorneys and their clients where a portion of the attorney performance thereunder violated Business and Professions Code section 6125. Instead, Code of Civil Procedure section 1282.4 rejects a *Birbrower* rule having no relevance here, i.e., that non-California attorneys violate Business and Professions Code section 6125 by appearing before an arbitrator in California. (*Prudential Equity Group, LLC v. Ajamie*, *supra*, 538 F.Supp.2d at p. 608.) Code of Civil Procedure section 1282.4 has no bearing on the issues before us.

Brawerman and TMI's other efforts to distinguish *Birbrower* are similarly unavailing. First, they say that *Birbrower* was a "fee dispute with attorneys who were New York residents and worked exclusively for a New York firm" and this case is not. But they fail to say why this is relevant to severability where both cases involved facially legal agreements pursuant to which some performance was legal and some performance violated Business and Professions Code section 6125.

Next, they say "*Birbrower* did not make findings regarding the enforceability of an arbitration provision, nor did it permit severance of just an arbitration provision." But they fail to explain how arbitration provisions are somehow less severable than other provisions of contracts. If anything, the strong public

18

policy favoring arbitration weighs in favor of severance.  (Cf. *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1144. ["In keeping with California's strong public policy in favor of arbitration, any doubts regarding the validity of an arbitration agreement are resolved in favor of arbitration"].)

Next, Brawerman and TMI say that *Birbrower* is distinguishable because there was no "bait and switch" concerning the attorneys' qualifications.  Without citation, they claim that the attorneys in *Birbrower* "were forthcoming both as to their lack of licensure and as to who handled the matter."  This is a gross misrepresentation of *Birbrower*.  The *Birbrower* court specifically stated "Birbrower asserts, and ESQ disputes, that ESQ knew Birbrower was not licensed to practice law in California." (*Birbrower*, *supra*, 17 Cal.4th at p. 125.)  The *Birbrower* court found the issue of disclosure or non-disclosure irrelevant.  (*Id.* at p. 136.)  Thus, the *Birbrower* decision neither relies upon nor references any finding that the attorneys there were "forthcoming" about their lack of licensure.

Brawerman and TMI continue that severance was practicable in *Birbrower* because the court "was able to identify two separate agreements within the single retainer agreement, the first was for legal services in New York by licensed New York attorneys, and the second agreement was for the unlicensed practice of law in California."  Again, not so.  There were two agreements in *Birbrower* but they were successive agreements for the same services, the second modifying the terms of the first. (*Birbrower, supra,* 17 Cal.4th at p. 139 & fn. 6 ["[T]he parties entered into a contingency fee agreement followed by a fixed fee agreement.  ESQ was to pay money to Birbrower in exchange for legal services."; "The parties apparently do not dispute that they

19

modified the original contingency fee arrangement to call for a fixed fee payment of over $1 million"].)  Nowhere in *Birbrower* does the court suggest that the California and New York services were separately contracted; indeed, the fact of its remand to the trial court to determine the feasibility of severance is conclusive that they were not.

We now turn to Brawerman and TMI's specific arguments against the enforcement of the arbitration provision.

**1.  *Sheppard* Required More than the Fact of an Ethical Violation to Invalidate the Engagement Agreement**

According to Brawerman and TMI, Sheppard reflects the rule "that when an attorney violates the Rules of Professional Conduct in the *performance* of the legal services contracted for under a retainer agreement, that retainer agreement is entirely unenforceable as against public policy and any arbitration provisions contained in such an agreement cannot be enforced[.]" This reading of *Sheppard* completely misrepresents its holding.

In *Sheppard*, entry into the engagement agreement *itself* was an ethical violation because Sheppard represented J-M's litigation adversary in another matter.  (*Sheppard, supra,* 6 Cal.5th at p. 87.)  Put another way, it was impossible for Sheppard to enter into the engagement agreement with J-M without committing an ethical breach.  As a result, the entire object of the engagement agreement was an engagement that Sheppard was prohibited to take on.  (*Id*. at p. 86.)

20

Here, in contrast, there was nothing inherently illegal about the Retainer Agreement, and Loeb was capable of performing it legally.[6] The object of the agreement, as found by the trial court, was not Kelly's representation, but rather "[Loeb's] representation of [Brawerman and TMI] in the Wasserstein transaction."

Particularly in their reply brief, Brawerman and TMI ignore this finding and urge a different object purportedly harbored by Loeb: "to secretly disregard [Brawerman's and TMI's] expressed object [to obtain the best legal counsel to represent them] and provide Kelly, an unlicensed, untested, and legally incompetent person." But we are not free to rewrite a trial court's factual findings. A contract's object is a function of the parties' intent. (*Houge v. Ford* (1955) 44 Cal.2d 706, 713 ["The object . . . of the parties' contract must be determined by their intent at the time of its execution . . . ."].) We therefore review the trial court's determination of the Retainer Agreement's object for substantial evidence. (See *Redke, supra,* 6 Cal.3d at p. 103 ["questions of 'intent' and 'purpose' are ordinarily questions of fact to be determined by the trial court"].)

---

[6] In their reply brief, Brawerman and TMI attempt to better align their facts with those of *Sheppard* by asserting that Loeb and Kelly's representation of Brawerman and TMI constituted an undisclosed conflict of interest. They failed to raise this argument below and provide no justification for holding it until their reply brief. As such, it is doubly waived and we decline to consider it. (*Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1135 ["Having failed to raise this argument with the trial court or in their opening brief, appellants have 'doubly waived' the argument"].)

Substantial evidence supports the trial court's findings regarding the object of the Retainer Agreement.

The parties executed the Retainer Agreement because Brawerman and TMI required legal services in negotiating a financing transaction and Loeb is a law firm that provides such services. As Brawerman explained, he sought out Loeb because he needed legal help and wanted the best representation in connection with the Wasserstein transaction. The Retainer Agreement is a typical form retainer agreement and is signed on Loeb's behalf by Rohlf, whose status as a California bar licensee at the time is undisputed. The Retainer Agreement provides that Rohlf would be "principally responsible for the representation," and assisted by "lawyers, law clerks and legal assistants" in carrying it out.

There is nothing unlawful about this arrangement. Kelly is not a signatory to the Retainer Agreement. The Retainer Agreement is not conditioned on his participation in the representation. Indeed, he is not even mentioned in it. Had Loeb not involved Kelly, there would be no complaint that the agreement was unlawful. At the time it entered into the Retainer Agreement, Loeb had a stable of California attorneys and was surely capable of representing Brawerman and TMI without violating any laws or public policy. Thus, the illegality lay not in the entry into the agreement but in its *performance*.

This is insufficient to invalidate the Retainer Agreement. The precise illegality in performance here was also present in *Birbrower*. Despite such illegality, the Supreme Court found that the Birbrower fee agreement remained enforceable to the extent of the work legally performed in New York pursuant to a valid license. We therefore must do the same here.

In a similar vein, Brawerman and TMI argue that we must find the arbitration provision invalid because the criminal nature of Kelly's violation is "[f]ar more egregious than the conduct in *Sheppard*." The question of legality or illegality of the agreement is a binary one: is or is not the object of the agreement a violation of law or some other expression of public policy? (See *Sheppard*, *supra*, 6 Cal.5th at pp. 73–74.) The *Sheppard* court invalidated the engagement agreement because it was entirely illegal, not based on its assessment of how "bad" the violation was. It simply concluded that the agreement called for Sheppard to do something it could not do without committing an ethical violation. Likewise, the *Birbrower* court did not uphold the fee agreement because it was unconcerned that the *Birbrower* attorneys had engaged in the criminal unlicensed practice of law in California. It simply concluded that the agreement was also for services that could be performed legally.

As the Retainer Agreement had a lawful object, the "egregiousness" of Loeb's and Kelly's illegal conduct in performing the agreement is of no moment.

## 2. Brawerman and TMI's Other Authorities Concerning Contracts in Violation of Public Policy Are Inapposite

Continuing to operate from the premise that the Retainer Agreement is inherently violative of public policy, Brawerman and TMI cite a number of other cases where California courts have refused to enforce such agreements. Each of these cases is distinguishable because the object of each was inherently unlawful. *Estate of Molino* (2008) 165 Cal.App.4th 913, 923; *Estate of Butler* (1947) 29 Cal.2d 644, 651; and *Estate of Collins* (1968) 268 Cal.App.2d 86, 89, 90, each involved "heir hunters"

23

whose agreements with potential heirs called for the non-lawyer heir hunter named in the agreement to perform legal services. These agreements were invalidated as against public policy. In contrast, the heir hunter agreement in *Estate of Wright* (2001) 90 Cal.App.4th 228, 235, was found to be legal because it did not require the non-lawyer heir hunter to perform legal services.

*Chambers v. Kay* (2002) 29 Cal.4th 142, 156–161, and *Altschul v. Sayble* (1978) 83 Cal.App.3d 153, 165–166, each concerned attorney fee sharing agreements that were, themselves, violations of the California Rules of Professional Conduct. The courts refused to enforce them as violative of public policy.

In *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 727, 734, 738, the court invalidated an agreement to broker the sale of a business because the named broker lacked the statutorily required license to engage in such brokerage. Similarly, in *Franklin v. Nat C. Goldstone Agency* (1949) 33 Cal.2d 628, 631–633, the Supreme Court remanded for a determination of whether individuals that sought payment on a contract for painting and decorating services were duly licensed contractors before a judgment enforcing their contract would enter. In each case, the court refused to enforce a contract to the extent the named party promising a service could not legally perform that service.

In sum, in each case where the agreement was invalidated, the agreement could not be performed without violating a law or public policy. Accordingly, none is like the Engagement Agreement, a facially legal agreement that only took on an illegal character as a result of Loeb's decision to perform the agreement in a partially illegal way.

24

In their reply brief, Brawerman and TMI discuss at length *Union Collection Co. v. Buckman* (1907) 150 Cal. 159. This case, too, involved a contract that was inherently illegal: prohibited gambling activity. When a gambling debt was settled through notes that were subsequently replaced and/or renewed with new notes, the Supreme Court refused to enforce the notes because they were all premised on the initial illegal gambling: "Merely repeating a promise based on an illegal consideration cannot give it validity." (*Id.* at p. 162.) The notes in *Union Collection Co.* thus bear no similarity to the Retainer Agreement, which is the first and only iteration of an inherently legal agreement by a law firm to provide legal services.

### 3. The Trial Court Properly Limited Its Analysis to Whether the Formation of the Contract Itself Was Illegal or Contrary to Public Policy

Brawerman and TMI claim that the trial court's analysis focusing on conduct at the time of formation was error and unsupported by *Sheppard*. Again, they misapprehend *Sheppard*. Brawerman and TMI cite *Haas v. Greenwald* (1925) 196 Cal. 236, 246–247 (*Haas*) as illustrative of an analysis that purportedly considered post-contracting violations as sufficient to render a contract "invalid due to illegal performance which occurred well after the *formation* of the contract." But *Haas* involved a contract that could not be performed without violating an express provision of law. (*Id.* at p. 247.)

Specifically, the defendant in *Haas*, a prospective real estate buyer, entered into an agreement with three men to provide him with real estate brokerage services. Two of the men held the licenses statutorily required to provide such services; the third did not. (*Haas, supra,* 196 Cal. 236 at pp. 240–241.)

25

Nevertheless, all three had jointly obligated themselves to provide the real estate brokerage services specified in the contract. The Supreme Court found the entire agreement unenforceable because the unlicensed broker's performance was expressly made an indivisible part of the consideration. (*Id.* at p. 247.) Thus, it was not the performance of the contract that rendered it illegal. Rather, it was illegal on its face because it expressly called for illegal conduct: one of the parties to the agreement had bound himself to provide services that he was prohibited by statute to provide. No similar facts are present in this case.

Brawerman and TMI's reliance on *Maryland Casualty Co. v. Fidelity & Casualty Co. of New York* (1925) 71 Cal.App. 492, 497, is similarly unavailing. Despite the broad language they quote explaining the rationale for invalidating illegal contracts, it is qualified by the following statement, which they fail to quote: "The power to invalidate agreements on the ground of public policy is so far-reaching and so easily abused that it should be called into action only in cases where the dangerous tendency clearly and unequivocally appears *from the contract itself.*" (*Ibid.,* italics added.) The court then proceeded to consider the subject of the agreement, as opposed to its performance, and found no violation of public policy. (*Id.* at p. 498.) The trial court did the same here and properly concluded that a law firm's agreement to provide legal services to its client is not violative of public policy.

In two different sections of their reply brief, Brawerman and TMI offer new arguments that simply evaluating the terms of the Retainer Agreement is inadequate to determine its legality. Rather, "an analysis of all facts [is required] to reach a determination as to whether the circumstances render the

26

agreement invalid." Whether required or not, the trial court *did* look beyond the four corners of the Retainer Agreement and still concluded that its object was legal. It considered evidence of Brawerman's intention in entering into the agreement, and particularly whether Kelly's involvement was significant in his decision. It considered evidence concerning the authorship of the agreement. It considered Brawerman's testimony about when Kelly "became the point person on the transaction." It considered Loeb's performance of the agreement through Kelly as well as numerous California licensed attorneys. After weighing this evidence, including inconsistencies noted, it found it inadequate to establish that Brawerman and TMI engaging Kelly was the object of the Retainer Agreement.

**4. Kelly's Work Before, and Purported Drafting of, the Retainer Agreement Do Not Render the Retainer Agreement Illegal**

Brawerman and TMI next argue that the Retainer Agreement was illegal from the start because (i) Kelly and Loeb started working on December 26, 2004, "weeks before the retainer [wa]s signed," and (ii) after Loeb created a draft of the retainer on December 28, 2004, Kelly later negotiated and redrafted the retainer.

As a preliminary matter, these asserted facts are contrary to the trial court's findings supported by substantial evidence. The trial court found that the Retainer Agreement "was effective as of December 28, 2004." The signed Retainer Agreement is dated December 28, 2004. Brawerman and TMI assert that the agreement was "backdated" but, as the trial court observed, Brawerman never testified to when it was actually signed. Brawerman and TMI asserted in briefing below, and again here,

that it was signed on January 11, 2005. But the record cite offered in support is merely a letter of transmittal which does not reference a signing date. Moreover, the trial court observed that Brawerman did not dispute the signing date in testimony before the arbitrator, and billing entries Brawerman and TMI say show ongoing revisions to the Retainer Agreement after December 28, 2004 could not have referred to the Retainer Agreement. Specifically, the trial court noted that Loeb time entry references—which were variously to "Finders Fee Agreement," "Engagement Letter," "Engagement Letter Re Finder for Equity Investment in Turtle Mountain," and "Finder's Engagement Letter"—continued through January 18, 2005, a full week after Brawerman and TMI argue Brawerman signed the Retainer Agreement. Brawerman and TMI cite exactly the same time entries to establish that Kelly drafted the Retainer Agreement. For the same reason that these time entries cannot be used to establish a signing date, they cannot be used to establish authorship.

Fact issues aside, Brawerman and TMI fail to explain how work prior to the execution of the Retainer Agreement, or Kelly's preparation of a form engagement letter for Rohlf's signature, render a facially legal and valid agreement between Loeb and Brawerman/TMI illegal as a matter of law. They cite no authority and assert only that we should "conclude that Kelly's illegal conduct permeates the entire agreement as it began before the retainer was executed and it was Kelly's own illegal conduct which created the retainer." The fact remains that the trial court found the object of the Retainer Agreement to be the engagement of Loeb and substantial evidence supports that conclusion. Moreover, Loeb's partially illegal performance of the agreement is

28

analogous to the performance in *Birbrower*. *Birbrower* is controlling.

### 5. Kelly's Involvement Did Not Render the Agreement Unenforceable

Brawerman and TMI's next argument is largely duplicative of arguments already addressed. They assert that "Kelly's central role and Loeb's participation renders the entire agreement unenforceable because the taint of illegality permeates the entire relationship, transaction, performance, and contract."

Brawerman and TMI cite *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 542 (*Kashani*), for dicta broadly describing when a bargain might be declared illegal—including where " 'no illegal performance is either promised or executed as the consideration for a promise.' " But *Kashani*, like *Sheppard*, involved a contract that promised illegal performance. The *Kashani* contract was for the establishment and financing of a computer factory in Iran in violation of executive orders prohibiting certain trade with Iran. (*Id.* at pp. 547–548.) Thus, *Kashani* is yet another case where legal performance of the contract was impossible. Brawerman and TMI cannot use *Kashani* to overcome *Birbrower* where the illegality in performance arising here did not invalidate the entire agreement because legal performance was also rendered under the agreement.

### 6. Illegal Consideration for Kelly's Services Is Severable from Services Provided by Licensed Attorneys

Brawerman and TMI argue that, "because the consideration provided under the agreement is illegal, the entire

29

contract is void and unenforceable as violative of public policy." *Birbrower* is again fatal to their argument. There, the Supreme Court found that, to the extent there was a practicable way to sever fees for licensed legal work from those payable for unlicensed legal work, the fee agreement remained viable and the fees for the licensed work remained recoverable. (*Birbrower*, *supra*, 17 Cal.4th at pp. 139–140.) Here, because Loeb charged hourly, the fees for Kelly's work are easily severable from the work that Loeb's licensed attorneys did. Indeed, they *were* severed by the arbitrator in ordering disgorgement.[7]

Instead of acknowledging *Birbrower*, Brawerman and TMI return to *Haas*. They mischaracterize it as holding that "where the law requires a license to perform a contracted for service, *everyone* performing the service must hold the license and if even one person does not hold the required license, the entire agreement is 'void' as violative of public policy." Again, the *Haas* real estate brokerage services contract was void because the contract *required* a non-licensee, named in the agreement, to illegally perform brokerage services. (*Haas*, *supra*, 196 Cal. at p. 247.) In contrast, the Retainer Agreement did not require Kelly's participation for Loeb to perform it. Loeb could have

---

[7]     In their reply brief, Brawerman and TMI argue that Loeb and Kelly's reliance on the license status of other Loeb attorneys on the matter "sounds in the doctrine of substantial compliance" (though Loeb and Kelly made no such argument), and then assert that such argument is waived. As Loeb and Kelly argued and the trial court found, the license status of the other California attorneys is relevant to severability under *Birbrower*. Brawerman and TMI's responses to an imagined substantial compliance argument are irrelevant.

30

performed under the agreement legally by assigning only California licensed attorneys to the matter.  That it did not does not render the agreement void.  (*Birbrower*, *supra*, 17 Cal.4th at pp. 139–140.)

### 7. Brawerman and TMI Forfeited Their Arguments That Claimed Violations by Other Loeb Attorneys Invalidated the Retainer Agreement

Brawerman and TMI argue that "every single attorney who assisted Kelly in representing appellants violated numerous ethical rules, thereby invalidating the entire agreement."

Brawerman and TMI raised this argument before the trial court for the first time on reply.  The trial court declined to adjudicate whether other Loeb attorneys had committed ethical violations because, "[i]f Plaintiffs believed that [Loeb] committed these ethics rule violations, then Plaintiffs unquestionably should have raised them in their moving papers to attempt to show the illegality of the Retainer Agreement.  In failing to do so, Plaintiffs deprived Defendants of an opportunity to respond to these separate and specific purported ethics rule violations."  Having found no justification for Brawerman and TMI's failure to timely raise the purported violations, the trial court properly declined to consider them.  We will not consider the asserted ethical violations for the first time on appeal, and the absence of a record establishing the asserted violations makes any such review impossible.[8]  (*Environmental Law Foundation v. Beech-Nut*

---

[8]     For example, Brawerman and TMI assert that every attorney working on the matter improperly aided Kelly in his unlicensed practice of law in violation of rule 5.5 of the Rules of Professional Conduct; failed to disclose this fact in violation of

*Nutrition Corp.* (2015) 235 Cal.App.4th 307, 325 [appellate review ordinarily limited to issues timely raised and decided below].)

In any event, even if such violations were found in the performance of the agreement, they would not render the entire agreement illegal because the object of the agreement was not illegal. Further, it appears that all of the attorneys involved in the matter in *Birbrower* committed statutory violations but the Supreme Court found this insufficient to render the entire agreement invalid. (*Birbrower*, *supra*, 17 Cal.4th at pp. 125, 139.)

### 8. The Trial Court Independently Considered the Legality of the Arbitration Agreement

Brawerman and TMI argue that "contract enforceability is determined by the court not the arbitrator. No deference is given to any such determination by the arbitrator." They are correct. But despite their detailed articulation of the trial court's obligation to independently evaluate the evidence and determine a contract's legality, Brawerman and TMI do not claim that the

---

rules 1.4 and 8.4; failed to create a system to prevent such ethical violations in violation of rule 5.1; and shared fees with a non-attorney in violation of rule 5.4. But key facts necessary to support the claimed violations are not in the record. Brawerman and TMI do not explain nor provide record citations establishing that each attorney working with Kelly (i) had knowledge of his bar status; (see Rules Prof. Conduct, rule 5.5(a)(2)); or (ii) had managerial authority within the Loeb firm (see *id.*, rule 5.1(a)). Nor do they show that Kelly was compensated for his work on the matter directly from fees paid by LLC as opposed to from Loeb's general revenues. (See *id.*, rule 5.1, cmt. 1.)

trial court failed to follow the rule. It plainly did. The trial court stated that it "evaluated, considered, and weighed all the evidence submitted by the parties in connection with [the motion to vacate], including Plaintiffs' reply. The Court . . . reached its own findings and conclusions as to the legality of the Retainer Agreement and the enforceability of the provision to arbitrate. The Court is not relying on, and has not relied on, [the arbitrator's] finding of legality."

This argument does not suggest, much less establish, any error.

**9. Arguments that Brawerman and TMI Relied on False Representations by Loeb and Kelly in Executing the Retainer Agreement Are Improper at This Stage**

Brawerman and TMI argue that Loeb and Kelly "cannot meet their burden of demonstrating the existence of a valid contract because, in addition to their unethical conduct, [Brawerman's] signature was obtained by fraud." Without record citations, they continue that Loeb and Kelly "both concede that they informed Brawerman that Kelly was an attorney *when he was not a licensed attorney*." This argument is not addressed in the trial court's decision so it is unclear whether Loeb and Kelly raised it to the trial court. But even if they had, it would not have been successful. They did raise the argument to the arbitrator and the arbitrator correctly observed that the claim was one for fraud in the inducement.

Our Supreme Court in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*) held that claims for fraud in the inducement are arbitrable. As explained in that case, "California law distinguishes between fraud in the

33

'execution' or 'inception' of a contract and fraud in the 'inducement' of a contract.  In brief, in the former case ' "the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is void.  In such a case it may be disregarded without the necessity of rescission." ' [Citation.]  Fraud in the inducement, by contrast, occurs when ' "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must *rescind* . . . ." ' [Citation.] " (*Id.* at p. 415.)

Here, there is no allegation that Brawerman was unaware that he was signing the Retainer Agreement.  He alleges only that he relied on false representations in doing so.  This is a claim for fraud in the inducement that was arbitrable and properly determined by the arbitrator.  (*Rosenthal*, *supra*, 14 Cal.4th at p. 417 ["In the absence of a contrary agreement, parties to a predispute arbitration agreement are presumed to have intended arbitration of controversies, including allegations of fraud in the inducement of the contract generally, that may allow rescission or reformation of the contract or part of it"].) It is not reviewable on appeal.  (*Moncharsh*, *supra*, 3 Cal.4th at p. 11; [courts cannot review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence supporting an arbitrator's award].)

### 10. The Arbitration Clause Is Severable from the Rest of the Retainer Agreement

Brawerman and TMI argue that "[n]o part of the contract, including the arbitration clause, can be saved by the application of severance because every single attorney at Loeb who worked on this matter violated ethics rules." As already noted, Brawerman and TMI's claim that every attorney at Loeb violated ethics rules was forfeited by their failing to timely assert this before the trial court. In any event, they fail to acknowledge, much less distinguish, *Birbrower*, where the attorneys involved in the matter had committed the same offense that serves as the core violation complained of here. As the Supreme Court found the *Birbrower* fee agreement severable, we also find the Retainer Agreement severable. The Retainer Agreement's arbitration provision therefore remains enforceable.

### 11. Brawerman and TMI Fail to Show How the Trial Court's Finding that Rohlf Supervised Kelly Could Be Prejudicial

Brawerman and TMI argue that the trial court erred in concluding that Rohlf supervised Kelly. However, they fail to explain how this finding is relevant to the enforceability of the Retainer Agreement's arbitration provision. Absent any such explanation, Brawerman and TMI fail to show the possibility of prejudice. We therefore decline to consider whether substantial evidence supports the trial court's conclusion. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)

### 12. Brawerman and TMI Fail to Show that Kelly was Not Entitled to Enforce the Arbitration Provision of the Retainer Agreement

Brawerman and TMI argue that "[t]he trial court committed an error of law by not weighing the rights of the plaintiff as to Kelly, separate from the rights of Loeb.  The law does not permit Kelly to enjoy the benefits of the contract." Brawerman and TMI did not present this argument to the trial court.  We therefore deem it forfeited.  (*Mahaffey*, *supra*, 218 Cal.App.4th at p. 1537.)

Even if we did not, we would find it waived for failure to support it with reasoned argument or authority.  (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*Malibu Hillbillies*) [appellate courts entitled to disregard assertions that are unsupported by argument or authority].) In particular, Brawerman and TMI fail to acknowledge that an employee or agent is ordinarily entitled to compel arbitration pursuant to an agreement between his or her employer or principal and the claiming party.  (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 18, fn. 9 [non-signatory may compel arbitration if a "sufficient 'identity of interest' exists" between the non-signatory and a party to the agreement, such as a "principal and agent" or "employer and employee" relationship].)

Finally, the argument is based on the false premise that "Kelly's illegal and fraudulent activity of practicing law without a license is the sole basis for compelling Appellants' malpractice claims against *Kelly* into arbitration."  This is incorrect.  The basis for compelling arbitration is the arbitration provision in the Retainer Agreement, which is a legal contract for the reasons already discussed.

**13. Appellants Forfeited Their Arguments Concerning Public Perception and Alleged Procedural Irregularities in the Arbitration by Failing to Raise them to the Trial Court**

Brawerman and TMI conclude their opening brief by arguing that "[t]he important public policies of preserving the public respect for the courts and its officers call for this court to set this matter for trial before the court."

Brawerman and TMI did not present this argument to the trial court. We therefore deem it forfeited. (*Mahaffey*, *supra*, 218 Cal.App.4th at p. 1537.)

Even if we did not, we would find it waived for failure to support it with reasoned argument or authority.[9] (*Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 153.) In particular, Brawerman and TMI fail to acknowledge that permissible grounds for setting aside an arbitration award are limited to those specified by statute (*Sheppard*, *supra*, 6 Cal.5th at p. 72) and they reference no statutory basis on which their argument relies.

---

[9]    The sole authority that Brawerman and TMI cite in support of their argument is as follows: "The Arbitrator prohibited Appellants from responding [to an objection to an interim award of interest filed by Loeb and Kelly] in violation of *Conservatorship of . . . Maria B.* (2013) 218 Cal.App.4th 514, 534 . . . ." It is unclear what Brawerman and TMI cite this case for, as it does not discuss the right to respond and does not involve an arbitration.

**DISPOSITION**

The judgment is affirmed. Costs are awarded to Respondents.

**CERTIFIED FOR PUBLICATION**


HARUTUNIAN, J.[*]

We concur:


GRIMES, Acting P. J.


WILEY, J.

---

[*]  Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.