Filed 12/10/25; Modified and Certified for Pub. 1/7/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>EDWARD CAGLE,<br><br>      Defendant and Appellant. | A171799<br><br>(Napa County<br>Super. Ct. No. CR137908) |

Edward Cagle appeals from a judgment pursuant to Penal Code sections 2970 and 2972 extending his commitment at Coalinga State Hospital as an offender with a mental health disorder (OMHD).[1]  He contends the trial court violated his due process and equal protection rights because it allowed a psychologist to opine that he represents a substantial danger of physical harm to others without using an actuarial risk assessment tool.  Both of these challenges, however, are forfeited by Cagle's failure to raise them in the trial court.  To the extent we consider his equal protection challenge, it has no merit.  He further argues the trial court erred by failing to instruct the jury

---

[1] Undesignated statutory citations are to the Penal Code.

1

on the meaning of one of the elements necessary to establish that he was an OMHD. We conclude that any instructional error was harmless. We also reject Cagle's claim that his trial counsel provided him ineffective assistance by failing to raise his novel due process and equal protection challenges. We will therefore affirm.

## BACKGROUND

Cagle was convicted in 2010 for assault with a deadly weapon with a prior serious or violent felony conviction. He was sentenced to prison for four years.

Cagle was apparently committed to a state hospital as a condition of parole, because in 2016 he was a patient at the Atascadero State Hospital and a petition was filed to extend his commitment for one year. His commitment was extended on that occasion and thereafter.

Cagle was committed to Coalinga State Hospital in 2018. His latest commitment before the present case was set to expire on December 11, 2024. The Napa County District Attorney filed a petition to extend Cagle's commitment for one year, alleging he continued to meet the definition of an OMHD.

The trial court held a trial on the petition in October 2024. Cagle's treating psychiatrist at Coalinga State Hospital, Dr. Joseph Liu, testified that Cagle suffered from schizoaffective disorder, bipolar type. Cagle was prescribed several different medications to treat his condition.

Cagle continued to exhibit symptoms of schizoaffective disorder despite his medications. Dr. Liu observed Cagle exhibit

2

mood swings, disorganized thought, disorganized speech, and auditory delusions. Dr. Liu described Cagle as easy to agitate and said Cagle would quite often "explode." Cagle believed he was God, Jesus Christ, and the owner of the hospital. Cagle lacked insight into his condition. He believed he did not need medication and that doctors would use medications to kill him. Cagle refused to take them without a court order, so the hospital administered the medications pursuant to an involuntary medication order. Cagle also did not voluntarily follow his treatment plan. He would not attend his treatment team group sessions.

A forensic psychologist, Dr. Amanda Dutton, testified that she believed Cagle had schizoaffective disorder, bipolar type. She observed symptoms of this disorder in an interview in which Cagle expressed paranoia, said he was Jesus Christ, claimed hospital staff were trying to harm him with medication, and appeared to experience auditory hallucinations. Cagle's speech was pressured, which can indicate mania. Dr. Dutton concluded Cagle had extremely limited insight into his illness, since he repeatedly denied having an illness or needing medication or other treatment. Cagle told Dr. Dutton that he would not take his medications or continue mental health treatment if he were unsupervised.

Dr. Dutton opined that Cagle represented a substantial danger of physical harm to others, based on his history of mental illness, his current functioning and symptoms, and his limited insight. Dr. Dutton also relied on Cagle's history of criminal

3

offenses and aggressive behaviors in the hospital. Cagle had been convicted in 2000 for battery on a non-prisoner. Dr. Dutton also considered Cagle's 2010 conviction for assault with a deadly weapon.

Cagle was involved in two aggressive incidents in April 2024. During the first April incident, Cagle became upset in the patient dining room and started screaming. Cagle had also altered his hospital-issued clothing, in violation of hospital rules, to display swastikas and various flags. During the second incident, he yelled unintelligibly and slammed his hands down on the table while holding an orange.

In early August 2024, Dr. Liu decreased one of Cagle's medications. Later that month, Cagle punched another patient. Cagle told staff members variously that the other patient had ratted on him earlier in the day and that he was not sure why he had punched the patient. He admitted that the other patient had not hit him.

During the People's discussion of the April and August 2024 incidents in closing argument at the trial, Cagle interjected twice, once to claim that the other patient had attacked him in August 2024 because he said the patient was a rat, and the other seemingly to affirm that he had acted violently three times in the confined setting of the hospital.

Dr. Dutton also relied on Cagle's history of receiving additional medication in specific instances to help him reduce his aggression. Cagle had received such medication in July 2024 due to verbal aggression and in response to the August 2024

4

punching incident. Dr. Dutton concluded that because Cagle continued having aggressive and violent behaviors in the hospital, she would expect that behavior to continue in the community, especially if he did not attend treatment.

Dr. Dutton was trained in the use of formal risk assessment tools. She was also trained to do risk assessments without formalized tools, by using her clinical judgment to identify risk factors. She did not use a formalized tool to assess Cagle's risk to determine whether he represented a substantial danger of physical harm to others because it is neither required nor commonly used for OMHD evaluations. Dr. Dutton had reviewed hundreds of OMHD evaluations and had yet to find one that used such a tool. Dr. Dutton admitted that formal risk assessment tools are based on scientific studies and use statistical analysis to validate their conclusions and recommendations. She conceded that her opinion regarding Cagle's risk was not based on any statistical or scientifically validated study and was only her professional clinical opinion.

After two days of testimony, the trial court instructed the jury on the findings necessary to recommit Cagle as an OMHD. The trial court delivered CALCRIM No. 3457, which told the jury that the necessary elements were: (1) Cagle "has a severe mental disorder"; (2) "[t]he severe mental disorder is not in remission or cannot be kept in remission without continued treatment"; and (3) "[b]ecause of his severe mental disorder he presently represents a substantial danger of physical harm to others." The instruction defined "remission" as meaning "that the external

5

signs and symptoms of the severe mental disorder are controlled by either a psychotropic medication or psychosocial support." Although CALCRIM No. 3457 also provides an optional definition of "cannot be kept in remission without continued treatment," the trial court omitted this definition.[2]

The jury found the petition true. The trial court signed an order extending Cagle's commitment to December 11, 2025.

## DISCUSSION

### I. Legal Background

"A mentally disordered offender proceeding is 'civil, rather than criminal, in nature.' [Citation.] 'The Mentally Disordered Offender Act . . . requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. [Citation.] Although the nature of an offender's past criminal conduct is one of the criteria for treatment as a mentally disordered offender . . . , [the] Act itself is not punitive or penal in nature. [Citation.] Rather, the purpose of the scheme is to provide

---

[2] The omitted definition states, "A *severe mental disorder* cannot be kept in remission without treatment if, during the period of the year prior to [the date of trial], the person . . . [¶] [w]as physically violent except in self-defense," "[m]ade a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family," "[i]ntentionally caused property damage," or "[d]id not voluntarily follow the treatment plan." (CALCRIM No. 3457.)

6

[mentally disordered offenders] with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder.' [Citation.]

"If the individual's severe mental health disorder is not in remission or cannot be kept in remission without treatment after the initial term, the district attorney may file a petition asking the superior court to continue involuntary treatment for an additional year.  (§ 2970, subds. (a) & (b).)  Each yearly extension requires the court or jury to find beyond a reasonable doubt that 'the patient has a severe mental health disorder, that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others.' (§ 2972, subds. (a)(2) & (c).)" (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 150 (*Jenkins*).)

## II. Due Process

Cagle contends that the commitment order violates his right to due process because the evidence at trial that he represented a substantial danger of physical harm to others consisted solely of Dr. Dutton's professional opinion and did not include the results of a formal risk assessment tool.  Relying on the concurring opinion of Justice Buchanan of the Fourth District Court of Appeal, Division One, in *Jenkins, supra*, 95 Cal.App.5th at pages 156–160, Cagle contends that mental health experts' unstructured professional opinions are not sufficiently reliable on their own to support an OMHD commitment.

7

Cagle frames his argument based on the four-factor balancing test from *Moore v. Superior Court* (2010) 50 Cal.4th 802, 819 for determining what process is due to a defendant in a civil commitment proceeding. But the thrust of Cagle's argument is not that the trial court's procedures were flawed or that some other procedure should have been used. His argument concerns the sufficiency of the evidence against him. As Cagle admits in his reply, his fundamental contention is that Dr. Dutton's trial testimony was "untethered," "speculative," and not sufficient to support the jury's verdict because she "explicitly did not use a more reliable method" of determining dangerousness.[3] Cagle's argument is thus more accurately framed as a *Kelly*- or *Sargon*-type challenge to the reliability of unstructured expert opinions for assessing an OMHD's dangerousness.[4]

---

[3] Notably, Cagle does not argue that clinical observations should play no part in expert opinions as to dangerousness; he instead "contends that the [OMHD] evaluation should *also* include the use of one or more scientifically-based risk assessment tools." (Italics added.)

[4] *People v. Kelly* (1976) 17 Cal.3d 24, 30, held that before new scientific technique, theory, or process evidence can be introduced, there must be a showing that, among other things, the reliability of the technique, theory, or process is generally accepted in the scientific community. A published appellate case allowing the admission of evidence becomes controlling, "at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Id.* at p. 32.) *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 (*Sargon*), held that trial courts must act as gatekeepers to exclude expert opinion testimony that is speculative or unreliable in other ways. This gatekeeping function is independent of *Kelly*. (*Id.* at p. 772, fn. 6.)

In general, a claim that the evidence is insufficient to support the judgment may be raised on appeal even when no such argument was asserted in the trial court. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126; *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17.) But the claim may be deemed forfeited when the appellant contends that expert opinion testimony is insufficient for reasons that would have supported a *Sargon*-type challenge to its admission. (See, e.g., *Environmental Law Foundation v. Beech-Nut Nutrition Corp.* (2015) 235 Cal.App.4th 307, 325; *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1339–1340.) " 'The reason for [the forfeiture] rule is that "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." [Citations.] "[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." [Citation.]' [Citation.] 'Had [appellant] timely and specifically objected below, the trial court presumably would have had an opportunity to correct, and could have corrected, any error.' " (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1101; accord, *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

This rationale applies with full force here and dictates that Cagle forfeited his due process argument by failing to raise it below. Because Cagle did not object that Dr. Dutton's opinion on dangerousness was inherently unreliable, the People were never

9

asked to provide evidence of reliability or to accede to Cagle's position and evaluate him with a structured risk assessment tool. Nor did the trial court have the chance to avoid the error Cagle complains of by requiring the People to present evidence of the result of a structured risk assessment tool.

While appellate courts have discretion to review some types of forfeited claims, "a forfeited claim of trial court error in admitting or excluding evidence is not subject to discretionary appellate review," except when the claim is a constitutional one and is closely related to a challenge *actually raised at trial* to the admission or exclusion of the evidence. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7, italics added.) Because Cagle's contention is fundamentally an evidentiary challenge to the admission of Dr. Dutton's expert opinion on dangerousness and he did not object to the admission of her opinion on any grounds below, this rule bars consideration of his forfeited claim.

Moreover, even if we had discretion to do so, we would not exercise it to review Cagle's challenge here because his failure to raise the issue below significantly hampers our consideration of it. The only information before us regarding the reliability of unstructured expert opinions comes from Justice Buchanan's concurrence in *Jenkins*. With no disrespect to Justice Buchanan, we cannot conclude that unstructured professional opinions are so inherently unreliable as to warrant exclusion based solely on his concurring opinion. Justice Buchanan cited several treatises regarding mental health evidence in support of his position that unstructured professional opinions are less reliable than

10

structured risk assessment tools.  (*Jenkins*, *supra*, 95 Cal.App.5th at pp. 156–160 (conc. opn. by Buchanan, J.) [citing, inter alia, Shuman, Psychiatric and Psychological Evidence (Dec. 2022 update) § 16:2; Appelbaum, Reference Guide on Mental Health Evidence in Reference Manual on Scientific Evidence (3d ed. 2011) p. 849; 2 Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony (2022–2023 ed.) § 9:11].)  A *Kelly* or *Sargon* hearing with examination and cross-examination of mental health professionals regarding the reliability of expert opinions in this field is the proper method for discerning whether Justice Buchanan's views and those of his sources are representative of those of the mental health profession as a whole.

Even assuming the sources in Justice Buchanan's concurrence are correct that structured tools are more reliable than unstructured opinions, this does not necessarily mean unstructured opinions should be excluded, nor does it establish what tools would be sufficient.  A treatise cited by Justice Buchanan suggests that most techniques, including those based solely on clinical observation, exceed 60 percent accuracy at predicting recidivism (with a coin toss being 50 percent accurate), but very few achieve better than 75 percent.  (Faigman, *supra*, § 9:11.)  If unstructured opinions are not sufficiently reliable at 60 percent accuracy, it is not obvious what level of accuracy makes a prediction sufficiently reliable.  In addition, as Justice Buchanan noted, different risk assessment tools have varying degrees of structure (*Jenkins*, *supra*, 95 Cal.App.5th at pp. 157–

11

158 (conc. opn. by Buchanan, J.)), and there are tradeoffs involved in choosing the degree of structure (e.g., Faigman, *supra*, § 9:11). For example, the creators of one structured tool advise a professional review before finalizing the score from the tool because of the possibility that rare risk factors, which by their nature would not appear in an actuarial instrument, would influence the risk in a given case. (*Ibid.*) A *Kelly* or *Sargon* hearing would be helpful for exploring such issues. We decline to foist uncertainty upon the trial courts by declaring opinions like Dr. Dutton's to be inadmissible simply because they may be less reliable than the alternatives, without being able to explain precisely what bar they fail to clear or what tools can be used instead.

The need for precision and nuance in this area also raises the question of whether Justice Buchanan's concerns are better addressed by the Legislature, which can investigate the different risk assessment tools available and mandate their use in specific ways for OMHD assessments, as it has done in other areas of the law.[5] But if appellate courts are to lead the way in this area, at a minimum we must have more information to do so. The only information in the record here is Dr. Dutton's testimony that although she was trained in the use of formal risk assessment tools, such tools are not commonly used for OMHD evaluations and that she could assess Cagle's risk without such tools because

---

[5] We discuss *post* Cagle's challenge to the Legislature's choice of mandating the use of a specific tool for sexually violent predator commitments but not requiring the use of any tools for OMHD commitments.

she was also trained in using her clinical judgment to identify risk factors. With nothing in the record to contradict this testimony, we cannot say that Dr. Dutton's opinion should have been excluded as inherently unreliable.

The People argue that *People v. Burnick* (1975) 14 Cal.3d 306 (*Burnick*), which Justice Buchanan cited (*Jenkins*, *supra*, 95 Cal.App.5th at p. 157 (conc. opn. by Buchanan, J.)), has already established that clinical expert opinions are admissible and that we cannot gainsay *Burnick*. In language from *Burnick* that Justice Buchanan cited, our Supreme Court acknowledged that psychiatric predictions of civil committees' future actions are inherently speculative. (*Burnick*, at p. 328.) But *Burnick* declined to hold that psychiatrists should be prohibited from opining as to future dangerousness based on clinical observation or that a civil commitment based on such opinions constitutes a deprivation of liberty without due process of law. (*Ibid.*) Instead, the *Burnick* court relied on the speculative nature of psychiatric opinions as one of several reasons to hold that the standard of proof in civil commitment proceedings must be beyond a reasonable doubt, rather than a preponderance of the evidence. (*Ibid.*)

Cagle contends *Burnick* can be distinguished because it dealt with a mentally disordered sex offender commitment rather than an OMHD commitment. Even if *Burnick* were distinguishable on this basis, *Burnick*'s refusal to endorse the argument that Cagle brings here makes it imperative that he

13

develop a record adequate for demonstrating a sound reason to depart from *Burnick*. He has not done so.

## III. Equal Protection

Cagle contends that his commitment as an OMHD without the use of a structured forensic instrument also violated his right to equal protection. He contrasts the lack of a requirement for such tools in OMHD commitments with Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.; SVPA) commitments. Cagle contends SVPA commitments routinely use the Static-99R, an instrument that evaluates the recidivism risk of a potential sexually violent predator (SVP). (Welf. & Inst. Code, § 6601, subd. (c).)

Cagle forfeited this argument by failing to raise it below, just as he did with respect to his due process challenge. (See *People v. Sumahit* (2005) 128 Cal.App.4th 347, 354, fn. 3 [SVP forfeited equal protection challenge by failing to raise it in the trial court].) To determine whether the Legislature could justifiably distinguish between SVP and OMHD commitments in the use of structured risk assessment tools, we must first identify a specific tool or tools that could be applicable to Cagle. The sole tool to which Cagle points is the Static-99R, which appears to be used only for sex offenders. (*People v. Field* (2024) 106 Cal.App.5th 132, 152, fn. 8 ["The Static-99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the

14

victims."].) Cagle is not a sex offender. It seems likely that there are other structured risk assessment tools comparable to the Static-99R that the Legislature could use for OMHD commitments. (See *Jenkins*, *supra*, 95 Cal.App.5th at pp. 157–158 (conc. opn. by Buchanan, J.) [discussing different tools].) But without a record identifying specific tools and documenting any differences in reliability, cost, and other criteria between such tools and the unstructured expert opinions currently used in OMHD proceedings, it is impossible to decide whether the Legislature justifiably distinguishes between SVPs and OMHDs with regard to the use of such tools. (Cf. *People v. McKee* (2012) 207 Cal.App.4th 1325, 1330, 1339–1347 [discussing evidence presented at 21-day hearing comparing SVPs and OMHDs to justify differences between two types of commitments, including length of term].)

In any event, to the extent that we can evaluate Cagle's argument on this record, we conclude it has no merit. "The right to equal protection under both the federal and California Constitutions is intended to ensure that the 'government does not treat a group of people unequally without some justification.' " (*People v. Cannon* (2025) 18 Cal.5th 497, 517 (*Cannon*).) "[A]ny unequal treatment that is based on suspect classifications or that significantly burdens a fundamental right or interest is subject to strict scrutiny analysis," which is the most exacting level of constitutional review. (*Ibid.*) "If the statutory classification, however, does not differentiate based on a protected class or significantly burden a fundamental right or interest, the

15

legislation is presumed valid unless the *challenger* can establish ' "there is no *rational* relationship between a disparity in treatment and some legitimate government purpose." ' " (*Ibid.*) Under this standard, " '[t]he underlying rationale for a statutory classification need not have been "ever actually articulated" by lawmakers, nor "be empirically substantiated." [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must "treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review." [Citation.] "If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' " [Citation.] "[T]he logic behind a potential justification need [not] be persuasive or sensible — rather than simply rational." ' " (*Id.* at p. 518.)

"[D]espite the liberty interests involved, not ' "every detail of every civil commitment program is subject to strict scrutiny." ' " (*Cannon*, *supra*, 18 Cal.5th at p. 518.)  Our Supreme Court recently held in *Cannon* that the more lenient rational basis standard applied to an argument that the SVPA commitment scheme violates equal protection because it lacks the same jury trial advisement and waiver procedures as the OMHD law or statutes for defendants pleading not guilty by reason of insanity.  (*Cannon,* at p. 509.)  Although Cagle maintains that *Cannon* was wrongly decided, the parties agree that *Cannon* applies here and requires rational basis review of Cagle's equal protection challenge.

16

"The SVPA provides for the involuntary civil commitment of certain sex offenders before the end of their prison or parole revocation terms." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190.) There is a " 'complex administrative and judicial process' " required to civilly commit an individual as an SVP. (*Ibid.*) The process "begins when the Department of Corrections and Rehabilitation screens inmates at least six months before their release date ([Welf. & Inst. Code,] § 6601, subd. (a))" to determine whether they are potential SVPs. (*Walker,* at p. 190.) "This screening shall be conducted in accordance with a structured screening instrument developed and updated by the State Department of State Hospitals in consultation with the Department of Corrections and Rehabilitation." (Welf. & Inst. Code, § 6601, subd. (b).) If the Department of Corrections and Rehabilitation determines an inmate is a potential SVP, the commitment process then requires a full evaluation by the Department of State Hospitals, the filing of a petition for commitment in superior court, a probable cause hearing, and finally a trial at which the trier of fact must find beyond a reasonable doubt that the inmate meets the SVPA criteria. (*Walker,* at pp. 190–191.)

Cagle asserts the Static-99R is routinely used at SVPA trials to establish an SVP's likelihood of recidivism, while such tools are not used in OMHD commitments. (E.g., *Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876 ["likelihood of a [SVP] defendant to reoffend is generally established by expert testimony, which is usually based on the use of diagnostic tools,

such as the Static-99, to predict future violent sexual behavior"].) But the SVPA does not mandate the use of structured instruments at a trial to commit an inmate as an SVP; such tools are required only as screening devices at the outset of the process. (Welf. & Inst. Code, §§ 6603, 6601, subd. (b).) Even assuming Cagle is correct that the results of the screening instrument are commonly used at the eventual trial and are therefore a de facto part of proof that an inmate is an SVP, there is a rational basis for the Legislature to distinguish between SVPA and OMHD commitments in this regard.

As the People point out, SVPA commitments are indefinite, while OMHD commitments last one year. (Welf. & Inst. Code, § 6604; Pen. Code, § 2972, subd. (c).) Assuming for the sake of argument that Cagle is correct that structured tools like the Static-99R are significantly more accurate than unstructured opinions, the Legislature could reasonably decide that indefinite SVPA commitments demand the use of more reliable tools because the consequences of error in an indefinite SVPA commitment are more severe. It could decide that OMHD commitments do not require such tools because OMHD inmates have an annual opportunity to defeat the renewal of the commitment, which is sufficient safeguard against error. (Cf. *People v. McKee* (2010) 47 Cal.4th 1172, 1210 ["different classes of individuals civilly committed need not be treated identically"]; *People v. Washington* (2021) 72 Cal.App.5th 453, 474 [noting "the significant liberty interests at stake for an alleged SVP facing a potential indefinite commitment"].)

18

Cagle points out that the SVPA provided for two-year commitments when its procedures were first established, so that the indefinite nature of the commitment is not likely to have been the actual basis for the Legislature's decision to require a structured risk assessment tool for the SVPA. (Welf. & Inst. Code, former § 6604, as enacted by Stats. 1995, ch. 763, § 3.) A two-year SVPA commitment is still longer than a one-year OMHD commitment, so the same rationale applies, albeit with less force. Moreover, the SVPA was amended to make SVPA commitments indefinite almost 20 years ago. (See *People v. McKee, supra*, 47 Cal.4th at pp. 1185–1187 [describing voters' amendment that required indefinite commitment].) We may assume that the greater difference in the length of the respective commitments after that amendment explains the Legislature's decision since then not to add a requirement for a structured risk assessment tool to the OMHD commitment scheme. Under the applicable standard of review, the rationale for a difference in treatment between two groups need not ever have been articulated by the Legislature or have a foundation in the record. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881; accord, *Cannon, supra*, 18 Cal.5th at p. 518.) "To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity." (*Johnson*, at p. 881.) The justification the People offer supports the current disparity between SVPA and OMHD commitments with regard to the use of structured risk assessment tools like the Static-99R, which is sufficient to defeat

19

Cagle's challenge here. (Cf. *People v. McKee*, *supra*, 47 Cal.4th at pp. 1200–1201, 1210 [remanding for hearing regarding equal protection challenge to different length of commitments of OMHDs (under the prior name of mentally disordered offenders) and SVPs but recognizing " 'the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science' "].)

Cagle insists that his commitment is effectively indefinite like an SVPA commitment because he has been repeatedly recommitted. But Cagle's commitment has been repeatedly extended only because the People have continued to allege and prove beyond a reasonable doubt that Cagle still qualifies as an OMHD. If at any point the People fail to persuade a jury of this, then Cagle must be released. The placement of the burden on the People to continue to justify Cagle's commitment distinguishes OMHD commitments like his from SVPA commitments. Cagle also points out that even though an SVPA commitment is indefinite, SVPs are evaluated at least annually, and the evaluation can trigger a release process. (Welf. & Inst. § 6604.9, subds. (a), (d).) He asserts that the Static-99R is used in each annual SVP evaluation, but he cites nothing factual or legal to support the assertion. (See *id.*, subds. (a)–(b) [requiring only that a SVP "have a current examination of his or her mental condition made at least once every year" in the form of a declaration by a professionally qualified person considering whether the person meets the definition of an SVP and whether conditional or unconditional release is in the person's best interests].) The

Legislature could reasonably decide that for OMHDs, the requirement of annual proof beyond a reasonable doubt to a neutral decisionmaker, as opposed to an internal annual clinical evaluation by the Department of State Hospitals, suffices to end inappropriate OMHD commitments, without the need to use structured predictive tool every year.

## IV.    Jury Instruction

Cagle next challenges the jury instructions on the second element for an OMHD commitment, that his severe mental health disorder "is not in remission or cannot be kept in remission without continued treatment." (§ 2972, subd. (c); CALCRIM No. 3457.) Cagle faults the trial court for not including CALCRIM No. 3457's definition of "cannot be kept in remission without treatment," which he contends means the opposite of the normal meaning of the phrase. CALCRIM No. 3457 draws from section 2962, subdivision (a)(3), which lists circumstances that will prove a defendant's mental disorder cannot be kept in remission without treatment. Those circumstances are "a violent act except in self-defense, a serious threat, intentional property damage or failure to follow the treatment plan." (*People v. Burroughs* (2005) 131 Cal.App.4th 1401, 1407.)

It may have been preferable for the trial court to deliver CALCRIM No. 3457 in full, since it would have given the jury a check list to use if it wanted to consider whether the People had established Cagle's mental disorder could not be kept in remission without treatment. However, the bench notes to the

21

instruction state, "Case law provides no direct guidance about whether a finding of an enumerated act is necessary to show that the disorder cannot be kept in remission without treatment or whether some alternative showing, such as medical opinion or non-enumerated conduct evidencing lack of remission, would suffice." (CALCRIM No. 3457, Bench Notes.) As the notes further observe, *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1161, fn. 4, suggested that proof of an enumerated act is necessary, though its observation was dictum. (CALCRIM No. 3457, Bench Notes.) But we need not decide whether the omission of the definition of "cannot be kept in remission without treatment" was error. If it was, the error was harmless beyond a reasonable doubt. (*People v. Roberge* (2003) 29 Cal.4th 979, 989 [assessing prejudice in SVPA commitment with the beyond a reasonable doubt standard].)

The second element for an OMHD commitment was satisfied if Cagle's disorder either was not in remission or could not be kept in remission without treatment. Cagle concedes that the People presented substantial evidence that his mental disorder was not in remission despite treatment. The People emphasized in closing Dr. Liu's and Dr. Dutton's testimonies that Cagle's disorder was not in remission and that there was no evidence to the contrary. The People briefly noted Dr. Dutton's testimony that Cagle's disorder could not be kept in remission without treatment and that Cagle would decompensate if released because he would not take his medication. But the People told the jury that it did not "need to get to that" given the

22

evidence that his disorder was not in remission.  Thus, the jury had no reason to rely on the concept of "cannot be kept in remission without treatment," making the omission of the definition of that phrase inconsequential.

Moreover, even if the trial court had delivered the definition of "cannot be kept in remission without treatment," the jury assuredly would have found that aspect of the element true. The definition states that a defendant's condition cannot be kept in remission without treatment if, during the last year, the defendant was physically violent not in self-defense, made a threat of violence, caused property damage, or did not voluntarily follow the treatment plan.  (CALCRIM No. 3457.)  The evidence showed that Cagle was violent with a fellow patient who did not hit him, destroyed state property by drawing swastikas and various flags on his clothing, refused to take medication without a court order, and refused to attend his treatment team group sessions.  Cagle did not call any of this evidence into any significant doubt.  Because there is no question that the jury would have found that Cagle's disorder cannot be kept in remission according to the omitted definition, any error in failing to deliver that definition was harmless.

## V. Ineffective Assistance of Counsel

Finally, Cagle argues that to the extent he forfeited any of his arguments by failing to raise them below, he received ineffective assistance of counsel.  Because we conclude Cagle forfeited his due process and equal protection arguments, we

23

consider whether his counsel gave him ineffective assistance by failing to raise those challenges below.

To prevail on a claim of ineffective assistance of counsel, a "defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) We assess the reasonableness of a counsel's representation "in light of 'the professional norms prevailing when the representation took place.'" (*In re Long* (2020) 10 Cal.5th 764, 773.) In a direct appeal, reversal for ineffective assistance of counsel is warranted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*Arredondo*, at p. 711.)

Cagle's counsel was not constitutionally ineffective for failing to challenge the admissibility of Dr. Dutton's expert opinion on dangerousness or the lack of evidence from a structured assessment tool. Cagle's counsel's actions are assessed in light of prevailing professional norms, and as discussed *ante*, *Burnick* was and is the latest case to squarely address the subject. *Burnick* declined to exclude psychiatric opinions based on clinical observation, so notwithstanding Justice Buchanan's concurrence in *Jenkins*, Cagle's counsel was not deficient for failing to try to exclude Dr. Dutton's testimony. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1328–1329

24

[rejecting ineffective assistance claim in light of unsettled state of the law supporting argument not raised in the trial court].) Cagle's position is that the law should be changed in accordance with Justice Buchanan's concurrence in *Jenkins*. But the concurrence is just that: a concurrence, signed by only a single justice and not precedential. (*People v. Superior Court* (*Persons*) (1976) 56 Cal.App.3d 191, 194 ["opinions of individual justices which do not have the concurrence of a majority of the justices are not precedent, and constitute only the personal views of the writer"].) Even if Justice Buchanan's concurrence could be said to have created a split or uncertainty in the law, Cagle's counsel would still not be constitutionally ineffective for failing to move to exclude Dr. Dutton's opinion or demand evidence of a structured assessment. Counsel's representation does not fall below an objective standard of reasonableness for failing to raise an issue on which the law is unsettled. (*People v. Foster* (2003) 111 Cal.App.4th 379, 385 ["Given that there is no California authority establishing whether or not [a prosecutor's] questions were proper, defendant cannot establish that counsel's failure to object to the prosecutor's questions in this case 'fell below an objective standard of reasonableness.' "]; cf. *In re Grinder* (2025) 114 Cal.App.5th 845, 871 ["as a general rule, a failure to anticipate changes in the law is not considered ineffective assistance of counsel"].)

## DISPOSITION

The judgment is affirmed.

25

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*People v. Cagle* (A171799)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>EDWARD CAGLE,<br><br>     Defendant and Appellant. | A171799<br><br>(Napa County Super. Ct. No. CR137908)<br><br>ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on December 10, 2025, be modified as follows:

1. On page 14, after the heading "III. Equal Protection," a subheading is added to read, "A. Forfeiture".

2. On page 15, at the end of the paragraph that ends with the citation to *People v. McKee* (2012) 207 Cal.App.4th 1325 and before the paragraph that begins with, "In any event," a subheading is added to read, "B. Merits".

There is no change in judgment.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B and IV.

The opinion in the above-entitled matter filed on December 10, 2025, was not certified for publication in the Official Reports.  For good cause, the request for publication is granted in part.  It is hereby ordered that the opinion should be published in the Official Reports as modified, with the exception of parts III.B and IV.


Date: _____                    _____ P. J.
                                                 Brown, P.J.

2

Trial Court:   Napa County Superior Court

Trial Judge:   Hon. Kecia Lind

Counsel:    Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

       Rob Bonta, Attorney General, Charles C. Ragland and Jeffrey M. Laurence, Assistant Attorneys General, Seth K. Schalit and Catherine A. Rivlin, Deputy Attorneys General for Plaintiff and Respondent.

*People v. Cagle* (A171799)